UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN ADAMS,<br><br>        Plaintiff<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security<br><br>        Defendant | CIVIL ACTION NO. 1:15-CV-00708<br><br>(MEHALCHICK, M.J.) |

**MEMORANDUM OPINION**

This is an action brought under Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff John Adams's claims for disability insurance benefits and supplemental security income under the Social Security Act. This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. For the reasons expressed herein, the Commissioner's decision shall be **AFFIRMED** and Mr. Adams's request that the Commissioner's final decision be set aside shall be **DENIED**.

**I.**  **BACKGROUND & PROCEDURAL HISTORY**

Mr. Adams is an adult individual who resides in the Middle District of Pennsylvania in a house with his mother and seventeen year old son. He has a tenth grade education, no GED, and was forty-four years old as of his alleged onset date. He received vocational training to be a machinist before he left high school. Before the alleged onset of his disability, Mr. Adams

worked as a heavy equipment operator doing highway construction, and as an underground coal miner. He reported that on December 20, 2008, the combination of his impairments made it impossible for him to engage in any work. On August 16, 2011, Mr. Adams protectively filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. In both applications, Mr. Adams alleged that the following conditions limited his ability to work: mental issues, liver issues, depression, shortness of breath, back problems, and Hepatitis C. (Admin. Tr. 223; Doc. 10-7, at 6).

In connection with the initial administrative evaluation of his claims, Mr. Adams's allegations were evaluated by nontreating medical consultant Jeffrey Chimahosky ("Dr. Chimahosky"), and nonexamining State agency psychologist Sandra Banks ("Dr. Banks"). Mr. Adams's treating physician, James Joseph ("Dr. Joseph") also submitted a form he completed for the department of Public Welfare indicating that Mr. Adams was temporarily disabled.

On October 18, 2011, Dr. Banks assessed the severity of Mr. Adams's alleged mental impairments based on the evidence of record available as of that date. In her psychiatric review technique ("PRT") assessment, Dr. Banks found that there were medically determinable impairments that did not precisely satisfy the diagnostic criteria of listings 12.04 (Affective Disorder), 12.06 (Anxiety-Related Disorders), and 12.09 (Substance Addiction Disorders). (Admin. Tr. 72-73, 80-81; Doc. 10-3, at 8-9, 16-17). She found, however, that these impairments resulted in only: a mild restriction of activities of daily living; mild difficulties maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (Admin. Tr. 72-73, 80-81; Doc. 10-3, at 8-9, 16-17). Dr. Banks explained that Mr. Adams's mental status has been relatively intact at medical appointments, with fair attention span and concentration, and that Mr. Adams has not

received any specialized mental health treatment. Dr. Banks concluded that Mr. Adams's mental impairments were non-severe.[1] (Admin. Tr. 72-73, 80-81; Doc. 10-3, at 8-9, 16-17).

Mr. Adams arrived unaccompanied for evaluation at Dr. Chimahosky's office on December 7, 2011. (Admin. Tr. 326-28; Doc. 10-8, at 58-60). Dr. Chimahosky noted that Mr. Adams was very vague about the symptoms associated with his lower back pain, and complained of weakness, fatigue, and joint pain secondary to Hepatitis C. (Admin. Tr. 326-28; Doc. 10-8, at 58-60). Mr. Adams also reported, however, that his treating physicians refused to treat his Hepatitis C because Mr. Adams still consumes alcohol. (Admin. Tr. 326-28; Doc. 10-8, at 58-60). Mr. Adams denied cardiovascular, respiratory, gastrointestinal, neurologic, and psychiatric symptoms. On examination Dr. Chimahosky noted that Mr. Adams was able to stand and sit comfortably, walk with a normal gait and smooth station, and that Mr. Adams had a normal range of motion and no pain to palpation in his spine. (Admin. Tr. 326-28; Doc. 10-8, at 58-60). Mr. Adams also exhibited a full range of motion in both of his upper extremities. (Admin. Tr. 326-28; Doc. 10-8, at 58-60). Dr. Chimahosky assessed lumbago and Hepatitis C, but commented that no findings were appreciated in the lumbosacral area, and that Mr. Adams was without any of the hallmarks suggestive of advanced liver disease from Hepatitis. (Admin. Tr. 326-28; Doc. 10-8, at 58-60). In an accompanying medical source

---

[1] If the degree of a claimant's limitation in activities of daily living, social functioning, and maintaining concentration, persistence, or pace is "none" or "mild" and the claimant has not experienced any episodes of decompensation, his mental impairments will be found non-severe unless the evidence otherwise indicates that his impairments result in more than a minimal limitation in his ability to engage in basic work activities. 20 C.F.R. § 404.1520a(d)(1), 20 C.F.R. § 416.920a(d)(1).

statement, Dr. Chimahosky opined that Mr. Adams had no physical limitations. (Admin. Tr. 329-30; Doc. 10-8, at 61-62).

On February 8, 2011, after examining Mr. Adams one time, Dr. Joseph completed an employability assessment form for the Pennsylvania Department of Public Welfare, and an information request from the Court of Common Pleas of Schuylkill County, Pennsylvania. (Admin. Tr. 302-07; Doc. 10-8, at 34-39). In both forms Dr. Joseph indicated that he believed Mr. Adams would be continuously unable to work from February 5, 2011, through March 21, 2011. (Admin. Tr. 302-07; Doc. 10-8, at 34-39). He also assessed that the date that Mr. Adams could be anticipated to return to work depended on orthopedic clearance due to his left ankle fracture. (Admin. Tr. 302-07; Doc. 10-8, at 34-39). Dr. Joseph submitted a second employability assessment form that indicated that Mr. Adams would be temporarily unable to work from January 2011 through June 2011. (Admin. Tr. 310-11; Doc. 10-8, at 42-43).

Mr. Adams's claims were denied at the initial level of administrative review on December 20, 2011. Following this denial, Mr. Adams requested a hearing before an Administrative Law Judge ("ALJ"). His request was granted, and on December 10, 2012, he appeared unrepresented before ALJ Raymond Zadzilko. After the ALJ explained Mr. Adams's right to representation, Mr. Adams requested that his hearing be continued so that he could obtain counsel. The ALJ granted Mr. Adams's request, and the hearing was continued until April 5, 2013.

On April 5, 2013, Mr. Adams appeared with his attorney for a second administrative hearing before ALJ Zadzilko. Impartial vocational expert Fred Monaco ("VE Monaco") also appeared and testified. During this hearing, Mr. Adams testified that he has suffered from back pain for between ten and twelve years. (Admin. Tr. 45; Doc. 10-2, at 46). His pain originates

from his lower back but radiates through both of his legs. (Admin. Tr. 46; Doc. 10-2, at 47). He reported that attempting simple tasks like running the vacuum precipitate pain. (Admin. Tr. 45; Doc. 10-2, at 46). Mr. Adams estimated that he retained the capacity to comfortably lift between twenty-five and thirty pounds, but admitted he would not be able to carry objects of that weight for long distances. (Admin. Tr. 45; Doc. 10-2, at 46). Mr. Adams testified that, although his back pain does limit his ability to sit and stand for long periods of time, he is able to sit for up to thirty minutes at one time, or stand for thirty minutes at one time without discomfort. (Admin. Tr. 45-46; Doc. 10-2, at 46-47). He reported that he could walk for a little bit, but that a combination of his back pain and respiratory difficulties limit his ability to walk for long distances. (Admin. Tr. 46; Doc. 10-2, at 47). He also reported that he could not engage in repetitive bending secondary to pain, and has difficulty with memory and concentration. (Admin. Tr. 52-53; Doc. 10-2, at 53-54). Mr. Adams testified that a long time ago it was recommended that he undergo back surgery, but that he preferred to manage his pain with medications. (Admin. Tr. 58-59; Doc. 10-2, at 59-60). Diagnostic imaging from 2000 revealed the impression of L5 "spondylolysis with Grade I to II over L5 upon S1 spondylolisthesis. Disc space narrowing at L4-5 and L5-S1." (Admin. Tr. 394; Doc. 10-10, at 17). An MRI from 2008 revealed the impression of "lumbar spondylosis" and small central herniation at L2-L3, L3-L4, and L4-L5. (Admin. Tr. 646; Doc. 10-13, at 45).

Mr. Adams testified that, in addition to his radicular pain, he experiences left ankle pain "every now and again," such that he "sometimes" has trouble walking on it. (Admin. Tr. 46; Doc. 10-2, at 47). The record reflects that Mr. Adams presented to the Saint Catherine Medical Center ("SCMC") Emergency Department on February 5, 2011, with complaints of left ankle pain after a fall. (Admin. Tr. 271-77; Doc. 10-8, at 3-9); (Admin. Tr. 582; Doc. 10-12, at 64). He

was diagnosed with a fracture. Follow-up x-rays showed that the fracture was in excellent position and alignment, and was healing. (Admin. Tr. 584; Doc. 10-12, at 66); (Admin. Tr. 586; Doc. 10-12, at 68). On March 16, 2011, an x-ray revealed mild degenerative changes of the left ankle joint. (Admin. Tr. 594; Doc. 10-12, at 77).

Mr. Adams also reported that he suffered a workplace injury to his left shoulder. He testified that as a result of this injury he cannot do any overhead lifting without pain. He also admitted that it would be difficult for him to pull on objects. (Admin. Tr. 47; Doc. 10-2, at 48). The medical records reflect that Mr. Adams was treated for left shoulder pain after he slipped and fell in October 2003. (Admin. Tr. 430-33; Doc. 10-10, at 53-56). In December 2003, after an MRI was taken, Mr. Adams was diagnosed with a partial tear of the rotator cuff supraspinatus tendon. (Admin. Tr. 441; Doc. 10-10, at 64). In January 2004 an orthopedic surgeon diagnosed left rotator cuff tendonitis and a partial thickness tear based on updated diagnostic imaging. (Admin Tr. 639; Doc. 10-13, at 38). The orthopedic surgeon noted that Mr. Adams had not received much conservative treatment, administered a corticosteroid injection, and recommended that Mr. Adams undergo physical therapy. (Admin Tr. 639; Doc. 10-13, at 38). In February 2004, it was noted that the injection provided relief for only a few days, Mr. Adams went to two physical therapy sessions before giving up, and that Mr. Adams could return to light duty work. (Admin Tr. 643; Doc. 10-13, at 42).

Mr. Adams also reported that, after working for years in a coal mine, he had developed significant respiratory problems. (Admin. Tr. 47; Doc. 10-2, at 48). His respiratory symptoms are triggered by hot humid conditions, and strong fragrances. (Admin. Tr. 52; Doc. 10-2, at 53). He also admitted that he suffers from uncontrolled hypertension that gets bad when he is nervous. (Admin. Tr. 48-49; Doc. 10-2, at 49-50). The medical record reflects that Mr. Adams

was evaluated at the SCMC Emergency Department with complaints of high blood pressure and chest pain on January 28, 2011. (Admin. Tr. 278-79; Doc. 10-8, at 10-11). A chest x-ray yielded normal results. (Admin. Tr. 285; Doc. 10-8, at 17). An EKG showed a normal sinus rhythm with a 1st degree AV block. (Admin. Tr. 281; Doc. 10-8, at 13). Treatment notes from Dr. Joseph dated February 10, 2011, reflect that Mr. Adams's chest pain had resolved. (Admin. Tr. 298; Doc. 10-8, at 30). A chest x-ray dated January 18, 2013, revealed diffuse nonspecific reticulonodular interstitial disease with no focal pulmonary parenchymal abnormalities. (Admin. Tr. 387; Doc. 10-10, at 10).

      Mr. Adams has also been diagnosed with Hepatitis C, which he alleges causes depression, makes him feel weak, and causes pain in his side "sometimes." (Admin. Tr. 50; Doc. 10-2, at 51). In March 2011, Mr. Adams told Dr. Joseph that he consumed one case of beer every two to three days. (Admin. Tr. 312; Doc. 10-8, at 44). During his hearing, Mr. Adams admitted that, although he has significantly reduced his alcohol intake, he still consumes approximately five beers per week. (Admin. Tr. 55; Doc. 10-2, at 56). An abdominal ultrasound dated March 18, 2011, revealed the impression of a minimally enlarged liver but was otherwise normal. (Admin. Tr. 318; Doc. 10-8, at 50). In May 2011, Mr. Adams denied any melena, hematochezia or hematemesis, or swelling in his abdomen or extremities. (Admin. Tr. 336; Doc. 10-9, at 3). An upper GI endoscopy ("EGD") revealed the presence of grade 1 esophageal varices, [2] and bleeding erosive gastropathy. (Admin. Tr. 376; Doc. 10-9, at 43). He

---

[2] Esophageal varices are abnormal enlarged veins (varices) in the lower part of the esophagus. They are superficial and liable to ulceration which results in bleeding. Stedman's Medical Dictionary 2091 (28th ed 2006).

was instructed that he was not a candidate for treatment of Hepatitis C while he was still using alcohol. (Admin. Tr. 354; Doc. 10-9, at 21). An abdominal CT scan dated June 2011 revealed mild diffuse fatty replacement of the liver with a small focal area of fatty sparing, but was otherwise unremarkable. (Admin. Tr. 363; Doc. 10-9, at 30). A February 2012, ultrasound revealed the impression of mild hepatomegaly with increased echogenicity, and sludge in the gall bladder was identified. (Admin. Tr. 624; Doc. 10-13, at 23). A CT scan performed the next month revealed the impression of fatty liver and chronic changes without acute inflammatory findings. (Admin. Tr. 630-31; Doc. 10-13, at 29-30).

Mr. Adams also testified that he gets "severe headaches" or migraines twice per week. (Admin. Tr. 50-51; Doc. 10-2, at 51-52). He reported that he was admitted to a hospital in 2007 for psychiatric issues after he blacked out at work for no reason. (Admin. Tr. 48-49; Doc. 10-2, at 49-50). The medical records reflect that Mr. Adams was admitted to the hospital on June 2, 2007, after he attempted to drink himself to death in a suicide gesture. (Admin. Tr. 442; Doc. 10-11, at 2). Mr. Adams was transferred to the ICU for twenty-three hours while he recovered before he was transferred for psychiatric treatment.

On May 23, 2013, the ALJ denied Mr. Adams's claims because he found that Mr. Adams failed to meet his burden of proving that he has a severe physical or mental impairment that could be expected to limit his ability to engage in basic work activities for twelve consecutive months. Upon receiving the ALJ's unfavorable decision, Mr. Adams sought review of his claims by Appeals Council of the Office of Disability Adjudication and Review. His request for review was denied on February 9, 2015, making the ALJ's May 2013 decision the "final decision" of the Commissioner subject to judicial review.

Mr. Adams appealed the Commissioner's final decision by filing the complaint in this action on April 10, 2015. (Doc. 1). In his complaint, Mr. Adams alleges that the ALJ's findings of fact are not supported by substantial evidence, and that the ALJ applied an erroneous standard of law. (Doc. 1 ¶5). On June 15, 2015, the Commissioner filed her answer to Mr. Adams's complaint. (Doc. 9). The Commissioner asserts that the ALJ's findings of fact are supported by substantial evidence, and that the ALJ applied the correct standard of law. (Doc. 9 ¶8). Together with her answer, the Commissioner filed a certified copy of the transcript of the administrative record, including the evidence upon which the ALJ's decision was based. (Doc. 10). This matter has been fully briefed by the parties and is now ripe for decision. (Doc. 11; Doc. 14).

## II. STANDARD OF REVIEW

To receive benefits under Title II or Title XVI of the Social Security Act, the claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). To satisfy this requirement, the claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in significant number in the national economy. 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B). In addition, to be eligible to receive benefits under Title II of the Social Security Act, a claimant must be insured for disability insurance benefits. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131.

In evaluating the question of whether a claimant is under a disability as it is defined in the Social Security Act, the Commissioner follows a five-step sequential evaluation process.

C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing of Impairments"); (4) whether the claimant is able to do his past relevant work, considering his current residual functional capacity ("RFC");[3] and, (5) whether the claimant is able to do any other work that exists in significant numbers in the national economy, considering his current RFC, age, education, and work experience. *Id.* The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him from doing his past relevant work. 20 C.F.R. § 404.1512(a); 20 C.F.R. § 416.912(a). Once the claimant has established at step four that he cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform that are consistent with his RFC, age, education, and past work experience. 20 C.F.R. § 404.1512(f); 20 C.F.R. § 416.912(f).

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference); *Johnson v. Comm'r of Soc. Sec.,*

---

[3] A claimant's RFC is the most a claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1); *see also Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000). Before the ALJ goes from step three to step four, he or she assesses the claimant's RFC. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4). The RFC is used at step four and step five to evaluate the claimant's case.

529 F.3d 198, 200(3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536(M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Mr. Adams is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); *Burton v. Schweiker,* 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); *Ficca,* 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

**III.** **ANALYSIS**

In evaluating Mr. Adams's claim, the ALJ determined that Mr. Adams did not engage in substantial gainful activity during the relevant period. At step two the ALJ found that, although Mr. Adams had the medically determinable impairments of left shoulder tendonitis, history of left ankle fracture, lumbar degenerative disc disease, hypertension, hepatitis, depression, anxiety, and alcohol abuse, these impairments considered individually and in combination were not medically severe. Having made that finding, the ALJ ended his inquiry at step two of the sequential evaluation process, because absent a medically determinable severe impairment Mr. Adams could not meet the definition of disabled under the Social Security Act.[4] Mr. Adams argues that the ALJ erred in denying his claim at step two.

"An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on

---

[4] If a claimant does not have a severe medically determinable physical or mental impairment, or combination of impairments, that meets the durational requirements of the Social Security Act, the claimant will be found 'not disabled' at step two. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.
   In addition to his argument that the ALJ erred by failing to find in his favor at step two, Mr. Adams also argues that the ALJ erred at step three when he found that Mr. Adams's impairments did not meet or medically equal Listing 1.04, and that the ALJ erred "in determining that Plaintiff's residual functional capacity was that he could perform basic work activities; failing to mention whether Plaintiff could perform his past relevant work; and that the Plaintiff's physical and mental impairments do not significantly limit his ability to perform basic work activities." (Doc. 11 pp. 5, 6-7). The ALJ did not reach step three of the sequential evaluation process, and because step two does not require the ALJ to formulate a RFC assessment or evaluate whether a claimant can engage in his past relevant work. Because the ALJ made no findings on these issues, the Court cannot review whether they are supported by substantial evidence.

an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities)." SSR 85-28, 1985 WL 56856 at *3; 20 C.F.R. § 404.1521; 20 C.F.R. § 416.921; *see Bowen v. Yuckert*, 482 U.S. 137 (1987). However, "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step," and should instead be continued. SSR 85-28, 1985 WL 56856 at *4. "The burden placed on an applicant at step two is not an exacting one." *McCrea v. Comm'r of Soc. Sec.,* 370 F.3d 357, 360 (3d Cir. 2004). In *McCrea*, the Third Circuit observed that:

> The Commissioner's denial at step two, like one made at any other step in the sequential evaluation analysis, is to be upheld if supported by substantial evidence on the record as a whole. *See Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)("Neither the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."). Instead, we express only the common-sense position that because step two is to be rarely utilized as basis for the denial of benefits, *see* SSR 85-28, 1985 WL 56856, at *4 ("Great care should be exercised in applying the not severe impairment concept."), its invocation is certain to raise the judicial eyebrow."

*Id.* at 360-61. Thus, applying the Court's normal standard of review to the ALJ's analysis at step two, it must determine whether substantial evidence supports the ALJ's decision that Mr. Adams did not have a medically determinable severe impairment of combination of impairments.

In his brief, Mr. Adams generally alleges that all of the impairments identified as non-severe by the ALJ are medically determinable and severe. However, he only makes specific arguments with respect to three impairments: degenerative disc disease of the lumbar spine, breathing difficulties, and hepatitis. As such, the Court finds that Mr. Adams's generally asserts

that the ALJ's decision with respect to all of his impairments was not supported by substantial evidence lacks merit, but will address his specific allegations with respect to his breathing difficulties, back pain, and hepatitis.

In his decision, the ALJ addresses Mr. Adams's allegation of "breathing difficulties" as follows:

> He has stable function. In spite of the claimant's complaints of breathing problems, an imaging study on April 7, 2007 revealed clear lungs (Exhibit 11F). Dr. Joseph, a primary care provider, later indicated that the claimant exhibited unlabored breathing and normal breath sounds on March 3, 2011 (Exhibit 2F). Consistent with this evidence, Dr. Chimahosky, the consultative physical examiner, whose report is set forth below, explained that the claimant had a normal rate of respiration with no rales, rhonchi, or wheezes (Exhibit 3F). Additionally the evidence does not show that the claimant has required multiple emergency room visits, hospitalizations, or frequent pulmonologist treatment as a result of breathing difficulty.

(Admin. Tr. 16; Doc. 10-2, at 17).

In support of his allegation that the ALJ's decision is not supported by substantial evidence Mr. Adams relies on a January 18, 2013 chest x-ray that was not cited by the ALJ in his decision, which post-dates the opinion of Dr. Chimahosky. (Doc. 11, at 4). The Court contsrues this as an argument that the ALJ's decision is not supported by substantial evidence because the ALJ did not discuss the January 2013 chest x-ray. The January 2013 chest x-ray revealed:

> Chronic diffuse reticular-nodular interstitial prominence which appears fairly comparable to a previous study of 2 June 07 considering technical differences. No acute focal pulmonary infiltrates are demonstrated. There are no pleural effusions. The cardiac mediastinal silhouette and pulmonary vascular pattern are within normal limits. No significant osseous abnormalities are evident.

(Admin. Tr. 387; Doc. 10-10, at 10).[5] This x-ray, however suggests that any respiratory condition that is present has not worsened since 2007. Mr. Adams continued to work until December 2008, (Admin. Tr. 222; Doc. 10-7 at 6), and as noted by the ALJ was observed to have normal unlabored breathing in March 2011. Accordingly, the Court finds that Mr. Adams's argument lacks merit.

Next, Mr. Adams alleges that the ALJ erred when he found that Mr. Adams's degenerative disc disease of the lumbar spine or "back pain" was not severe. In support of his argument Mr. Adams relies on a 2008 MRI of Mr. Adams's lumbar spine. (Doc. 11, at 4). Unlike the January 2013 chest x-ray, the ALJ discussed the 2008 MRI in his written decision. (Admin. Tr. 15; Doc. 10-2, at 16). As such, the Court construes Mr. Adams's argument as an allegation that inferences drawn by the ALJ with respect to the 2008 MRI were unreasonable and not grounded in the record. The Court finds that this allegation lacks merit. As noted by the ALJ in December 2011, Dr. Chimahosky observed that Mr. Adams walked with a normal station, did not use an ambulatory device, possessed a full range of motion in his spine, displayed good mobility in all extremities, stood with a normal posture, had intact strength, and tested negative during straight leg raising. (Admin. Tr. 17; Doc. 10-2, at 18). The "substantial evidence standard is deferential and includes deference to inferences drawn from the facts if

---

[5] The June 2, 2007 study referred to in the body of the January 2013 radiology report was taken when Mr. Adams was hospitalized following a possible overdose. (Admin. Tr. 465; Doc. 10-11, at 25). It was noted in the June 2007 radiology report that Mr. Adams's heart appeared to be enlarged, but that the pulmonary vasculature and mediastinal structures were within normal limits. There was mild diffuse pulmonary interstitial prominence, no gross focal pulmonary parenchymal infiltrates, no evidence of pleural disease or pneumothorax, and intact visualized bony structures.

they, in turn, are supported by substantial evidence." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999). Furthermore, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo*, 383 U.S. at 620. Moreover, "[i]n the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.'" *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)(quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Although Dr. Chimahosky diagnosed Mr. Adams with "lumbago" he noted that there were no clinical findings appreciated in the lumbosacral area, and that when questioned about his pain Mr. Adams reported "pain on lifting and nothing more" and was completely unable to elaborate in further detail even when asked specific questions. (Admin. Tr. 326; Doc. 10-8, at 58). Dr. Chimahosky assessed that Mr. Adams had no physical limitations. Read in the context of this evidence, the Court finds that the ALJ's assessment that Mr. Adams's alleged degenerative disc disease was non-severe is supported by substantial evidence.

Last, Mr. Adams argues that the ALJ was "clearly incorrect" when he found that the treatment records did not reflect more serious symptoms of gastric varices. (Doc. 11, at 4). In support of his position, Mr. Adams cites to an upper endoscopy performed on May 13, 2011. The record reflects that Mr. Adams did have an upper endoscopy in May 2011, and that it revealed the impression of Grade I varices in the lower third of Mr. Adams's esophagus, and multiple dispersed small bleeding erosions were found in the gastric body. (Admin. Tr. 376; Doc. 10-9, at 43). In his decision, the ALJ noted that "[t]reatment records also do not reflect more serious symptoms such as scarring of the liver, liver cancer, esophageal varices, or gastric varices. (Admin. Tr. 16; Doc. 10-2, at 17). Although the ALJ was incorrect that there were no

esophageal varices, Mr. Adams fails to articulate how the presence of these varices would impact his ability to engage in basic work activities. The record as a whole reflects that Mr. Adams expressly denied a history of jaundice or other abdominal symptoms, no hepatosplenomegaly, and reported in December 2011 that his only hepatitis symptoms were weakness, fatigue, and joint pain. (Admin. Tr. 326; Doc. 10-8, at 58); *see also* (Admin. Tr. 16; Doc. 10-2, at 17). Given the absence of any evidence that these varices limit Mr. Adams's ability to engage in basic work-related activities, the Court is compelled to find that Mr. Adams's argument lacks merit, and that the ALJ's decision is supported by substantial evidence.

The ALJ's conclusion in this regard is bolstered by the fact that the only medical source statement of record, an opinion by an examining source, fully supports the ALJ's assessment that Mr. Adams has no physical limitations. Furthermore, the only treating source opinion of record suggests that Mr. Adams was temporarily disabled for a period of less than twelve months. As such the evidence is unambiguous that Mr. Adams does not have a severe impairment that meets the durational requirements under the Social Security Act.

### IV. CONCLUSION

Based on the foregoing, the Commissioner's decision shall be **AFFIRMED**, and Mr. Adams's request for relief shall be **DENIED**.

Dated: August 15, 2016                                     *s/ Karoline Mehalchick*
                                                          **KAROLINE MEHALCHICK**
                                                          **United States Magistrate Judge**